Judgment rendered April 13, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,349-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

GLADSTONE AREA                                  Plaintiff-Appellees
PARTNERSHIP, INC., AND
SWAN APARTMENTS, L.L.C.,
AND ASHLEY M. ATKINS

versus

CITY OF SHREVEPORT,                             Defendant-Appellants
LAKESHORE LIQUORE, BEER
& WINE 2, L.L.C., AND CHRIS
CASTEN

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 605,639

Honorable Michael A. Pitman, Judge

* * * * *

LAW OFFICE OF REGINALD W.                       Counsel for
ABRAMS, SR., LLC                                City of Shreveport
By: Reginald W. Abrams

NELSON W. CAMERON                               Counsel for
                                                Lakeshore
                                                Liquore, Beer &
                                                Wine 2, L.L.C.

CHRIS CASTEN                                     In Proper Person

SEABAUGH & SEPULVADO, LLC
By: Michael C. Melerine

Counsel for Appellees
Gladstone Area
Partnership, Inc., Swan
Apartments, LLC and
Ashley M. Atkins

NEIL ERWIN LAW, LLC
By: Neil T. Erwin

* * * * *

Before MOORE, COX, and STEPHENS, JJ.

COX, J. concurs with written reasons.

**MOORE, C.J.**

The City of Shreveport and Lakeshore Liquor Beer & Wine 2, LLC appeal a judgment that reversed the Shreveport City Council's decision, following a recommendation from the City's Metropolitan Planning Commission ("MPC"), to grant a special use permit in favor of Lakeshore to open a retail liquor store on a lot zoned C-2. The district court found that the MPC's recommendation, and the Council's decision to adopt it, was unreasonable, arbitrary, and capricious. For the reasons expressed, we reverse and render.

## FACTUAL BACKGROUND

The lot in question is at 327 Kings Highway (the southeast corner of Kings at Gilbert Drive), formerly a Circle K convenience store and zoned C-2 (commercial corridor, authorized to be open 24/7 and to sell beer and wine). Sometime after the Circle K vacated the building, Bernie Woods Sr., the owner of Lakeshore, applied to the MPC to open another Lakeshore store on the site (his other store is on Lakeshore Drive). Since Lakeshore would be selling liquor in addition to wine and beer, Mr. Woods applied for a special use permit ("SUP").

In November 2017, after about two months of study, including a four-page staff report, the MPC voted to approve the SUP, but with limited hours of operation and six stipulations that Lakeshore must meet.[1] Unhappy with

---

[1] Hours would be limited to 8 am until midnight; stipulations included (1) closing the driveway onto Gilbert Dr., (2) extending the sidewalks and landscaping over the former driveway, (3) irrigating all landscaping, (4) repairing all fences, (5) providing a new sign, (6) repairing the Dumpster enclosure.

the reduced hours and some of the expensive site revisions, Lakeshore appealed to the Council, to remove all stipulations.

Meanwhile, Gladstone Area Partnership, a local neighborhood association, and Swan Apartments LLC, a small complex about one block east on Kings, also appealed to the Council, to contest the grant of the SUP under any circumstances. They alleged that granting the SUP, even with the stipulations, was arbitrary and capricious because Lakeshore did not meet any of the criteria listed in the City's Uniform Development Code ("UDC"), § 16.3 E.

The Council met on November 28, 2017. Both appeals ended in a tie vote, 3-3. The City Attorney advised that the tie meant that the appeals were denied, and the MPC's recommendation was approved.

## PROCEDURAL HISTORY

Gladstone Area Partnership, Swan Apartments, and one individual (collectively, "Gladstone") filed this suit against the City, Lakeshore, and the owner of the property to reverse the Council's action and deny the SUP.[2] After additional pleading and discovery, Gladstone moved for summary judgment and the City filed a rule for declaratory judgment. After a hearing in August 2019, the district court remanded the matter to the Council to take a definitive vote (not a tie) that would "affirm, modify or overrule/reverse" the MPC.

The Council considered the matter on remand at its meeting on October 8, 2019, and it was a real spectacle. Gladstone brought in some 21 witnesses to testify against letting anybody open a retail liquor store so close

---

[2] In the caption of the original petition, the applicant's name is misspelled as "Lakeshore *Liquore*, Beer & Wine 2, LLC."

2

to a residential area and schools (Centenary College, Byrd High School, and Creswell Elementary); an undated report called "How Alcohol Outlets Affect Neighborhood Violence," taken from the website of an entity called the Prevention Research Center, Pacific Institute for Research & Evaluation; and a sheaf of over 1,300 signatures to a petition to "Oppose Liquor Store at corner of Gilbert & Kings Hwy." Lakeshore called three witnesses, including Mr. Woods and his son, and the Council accepted the MPC's original staff report. After about three hours of testimony and discussion, two members moved to grant the SUP, subject to additional stipulations.[3] With the additional stipulations, the motion passed, 6-1, and the SUP was granted.

Gladstone then moved to continue its appeal. In response to a scheduling order, the City introduced the complete MPC case file, transcripts of the Council's administrative and regular meetings, October 7 and 8, 2019, various correspondence, and 113 pages of petitions, oppositions, and support letters.

At a hearing limited to argument in September 2020, Gladstone argued that under UDC § 16.3 E, the MPC and Council were required to consider a list of elements that pertain to health, welfare, and safety, but there was "no evidence" that either body did so. It also argued that in early 2020, the Council amended the UDC to eliminate liquor sales on any property zoned C-2 if it abuts a residence; by that standard, Lakeshore would not qualify for the SUP. Gladstone also argued that six days before it

_____

[3] The business would have to close at 9 pm; in addition to the original six stipulations, Lakeshore would have to "enhance the façade and revise the site plan" by restoring a glass storefront, installing a "raised gabled parapet" and canopies, and adding siding, pilasters, brick columns, a front sidewalk, and ornamental planters.

granted Lakeshore's SUP, the Council denied a similar SUP for a retail liquor store only about 11 blocks away, resulting in inconsistent rulings. Finally, it argued that in voting to approve the SUP, certain councilmembers explicitly stated their high regard for Mr. Woods, who is African American, a leader in the Black community, a benefactor to youth programs, a USAF combat veteran, and a good businessman. This, Gladstone felt, negated the objectivity of the proceedings.

The City argued that Council's action could be reversed only if it was "arbitrary and capricious," which meant that there was *no evidence* to support it, and, in fact, there was ample evidence to support this grant of the SUP. The City also argued that the Council was not required to make an individual finding as to every item in UDC § 16.3 E, but only to consider them. The City denied that the Council ignored the concerns of the 1,300 signatures opposing the SUP, but submitted that by seriously limiting the hours of operation and imposing detailed stipulations, the Council had addressed most of those objections.

Lakeshore argued that its application had been pending for three years now, it had spent a lot of money, it had complied with all requirements, the Council had approved it 6-1, and courts should not disturb legislative actions. It also argued that unlike other SUPs that the Council had denied, in residential areas, 327 Kings Highway was an "eclectic" neighborhood, with tattoo parlors, restaurants that sell alcohol, and a wide array of small businesses. Lakeshore concluded that acting on an application is not just a matter of "counting witnesses," and that the Council's careful action was by no means arbitrary and capricious.

4

## ACTION OF THE DISTRICT COURT

The district court wrote a four-page opinion. After summarizing the facts, it found that under UDC § 16.3, the Council was "required * * * to consider the public health, safety and/or welfare," but, "in spite of overwhelming public opposition," there was "no explicit evidence in the record" that the Council actually considered these matters. The court also observed that public opposition is "an important factor that elected officials must consider" in SUP applications, citing *Papa v. City of Shreveport*, 27,045 (La. App. 2 Cir. 9/29/95), 661 So. 2d 110, *writ denied*, 95-2544 (La. 1/5/96), 666 So. 2d 295.

The court then noted that the Council had denied similar applications, one at the former Don's Restaurant location, Kings Highway at Highland Avenue at Line, and the other, on Centenary Boulevard at Olive Street, both very close to Lakeshore's site. The court concluded that these actions "may constitute non-uniform application of zoning ordinances that is arbitrary and capricious," citing *Papa*, *supra*.

Finally, the court cited the subsequent, January 2020 ordinance that prohibited sales of alcohol on any C-2 site "which abuts a residential zoning district." The fact that all six councilmembers who voted to grant Lakeshore's SUP in October 2019, also voted to ban such a result in January 2020, proved a nonuniform application of zoning rules that was unreasonable, arbitrary, and capricious. The court, therefore, reversed the Council's grant of the SUP to Lakeshore.

The City, and then Lakeshore, each appealed suspensively.[4]

---

[4] Gladstone moved to convert the appeal to devolutive, on grounds that the City never paid the $15,000 appeal bond. According to the minutes, the court "passed" this

5

## APPLICABLE LAW

Zoning is a legislative function, the authority for which flows from the police power of governmental bodies. *King v. Caddo Parish Com'n*, 97-1873 (La. 10/20/98), 719 So. 2d 410; *Racetrac Petroleum Inc. v. City of Shreveport*, 45,120 (La. App. 2 Cir. 7/21/10), 44 So. 3d 800. Courts do not interfere with this legislative prerogative unless the zoning decision is palpably erroneous and bears no substantial relation to the public health, safety, or general welfare. *Toups v. City of Shreveport*, 10-1559 (La. 3/15/11), 60 So. 3d 1215; *Racetrac Petroleum v. City of Shreveport*, *supra*. When there is room for two opinions, an action cannot be arbitrary and capricious when exercised honestly and on due consideration, even though it may be believed an erroneous conclusion was reached. *Toups v. City of Shreveport*, *supra*; *Carter v. City of Shreveport*, 51,589 (La. App. 2 Cir. 9/27/17), 244 So. 3d 659.

A special use permit is a dispensation whereby a landowner may vary from the strict terms of a zoning ordinance. *King v. Caddo Parish Com'n*, *supra*. The standards for granting an SUP must ensure equal treatment for all applicants to prevent the governing authority from exercising its power arbitrarily. *Id*.

A challenge to a zoning decision is a de novo proceeding on the issue of whether the result of the legislative action is arbitrary and capricious, and therefore a taking of property without due process of law. *Toups v. City of Shreveport*, *supra*.

_____

motion on June 14, 2021, and there is no further ruling. As a result, Lakeshore is open and selling liquor at this time.

6

In the absence of contrary legislative expression, substantive laws apply prospectively only. La. C.C. art. 6. Retroactive application of new legislation is constitutionally permissible only if it does not result in impairment of the obligations of contracts or in divestiture of vested rights. *Born v. City of Slidell*, 15-0136 (La. 10/14/15), 180 So. 3d 1227; *M.J. Farms Ltd. v. Exxon Mobil Corp.*, 07-2371 (La. 7/1/08), 998 So. 2d 16.

### THE PARTIES' POSITIONS

The City and Lakeshore both assign as error that the district court erred in reversing the grant of the SUP. The City urges that the court could not have found the Council's action unreasonable, arbitrary, and capricious. In support, it argues that the court should not have "counted witnesses"; could not have found, on an incomplete record, that the denial of SUPs at other locations was inconsistent with the grant of an SUP for Lakeshore; and should not have found that the subsequent amendment to UDC § 16.3 had any bearing on this action. Finally, it asserts the court was plainly wrong to find "no explicit evidence" that the Council considered the elements of health, safety, or general welfare listed in UDC § 16.3; in fact, the record shows that the MPC and Council carefully considered these elements, and actually exceeded them by requiring a new sign and various aesthetic improvements.

Lakeshore also contends that the Council fully considered the public's views, by imposing nine stringent stipulations. It concedes that Gladstone presented an overwhelming number of witnesses to oppose the SUP, but submits that most of these wanted to ban all alcohol sales, period. Lakeshore also urges that race relations are an integral part of public welfare, so the Council acted reasonably in considering Mr. Woods's role in

7

the Black community. It further contends that UDC § 16.3, as it provided in October 2019, did not require an "explicit statement" as to each factor, only a consideration of them. Finally, it urges that the court's retroactive application of the 2020 amendment is a denial of due process and vested rights, *Morial v. Smith & Wesson Corp.*, 00-1132 (La. 4/3/01), 785 So. 2d 1; *Moretco v. Plaquemines Parish Council*, 12-0430 (La. App. 4 Cir. 3/6/13), 112 So. 3d 287, *writ denied*, 13-0724 (La. 5/17/13), 118 So. 3d 376.

Gladstone maintains that the court committed no error. It first argues that the City and Lakeshore "failed to present any evidence that the Council properly granted" the SUP. Next, it contends that UDC § 16.3 "includes a mandatory requirement for specific findings of fact"; the Council's failure to make such findings resulted in unequal treatment for all applicants, a result prohibited by law. *Jenkins v. St. Tammany Police Jury*, 98-2627 (La. 7/22/99), 736 So. 2d 1287; *WRW Props. Inc. v. City of Shreveport*, 47,756 (La. App. 2 Cir. 1/16/13), 112 So. 3d 279. It submits that the evidence is "overwhelming and uncontradicted" against the SUP, citing the online report from the Pacific Institute for Research & Evaluation, the testimony of four of its own witnesses, and the earlier denial of a similar request for SUP. Finally, it criticizes the remarks of two councilmembers, who held Mr. Woods in esteem, as "granting their friend a monopoly" and conclusive proof of an arbitrary and capricious decision.

## DISCUSSION

### *Compliance with Approval Standards*

As noted, the burden is on the opponent of a zoning decision to prove that the decision had no substantial relationship to public health, safety, morals, or general welfare. *Toups v. City of Shreveport*, *supra*. The review

8

of the governmental action is de novo. *Id.* Gladstone's argument has misstated the burden of proof. It was not the *City's* (or Lakeshore's) burden to prove the propriety of the Council's decision to grant the SUP; rather, it was *Gladstone's* burden to disprove it. On de novo review, we have analyzed the record to see if Gladstone met its burden.

Gladstone first contends that the City failed to make specific findings in compliance with approval standards, UDC § 16.3. When the Council first heard this matter, in November 2018, § 16.3 did indeed require the MPC (or, on appeal, the Council) to "make findings to support their decision regarding" an SUP, based on four criteria. However, the district court vacated the results of that meeting, in an effort to clarify the ambiguity of the tie vote, and remanded the matter to the Council. Meanwhile, effective February 19, 2019, the Council had amended the UDC.[5] At the time of the instant hearing, October 8, 2019, § 16.3 E provided, in pertinent part:

> The Metropolitan Planning Commission or, on appeal, the City Council, must consider the following development standards and design specifications. The approval of a special use permit is based on a balancing of these development standards and design specifications [now increased to 12 criteria].

In short, there is no basis to negate the MPC's action or the Council's vote simply because they failed to enumerate findings keyed to the approval standards. The proper question is whether these entities considered them.

The standards are as follows:

1. The design, location, and operating plans must be such that the public health, safety and/or welfare is protected.
2. The proposed special use is compatible with the general land use of adjacent properties and other property within 300 feet.

---

[5] Gladstone has quoted only the earlier, superseded version in its brief to this court.

9

3. The special use conforms to the regulations of the zoning district where it will be located.
4. The location and dimensions of all public rights-of-way on or abutting the proposed special use.
5. Existing and proposed vehicular and pedestrian circulation systems; including streets, alleys, walkways, service areas and loading areas, the location and arrangement of off-street parking areas and all points of vehicular entrance and exit.
6. The outdoor surfacing and paving for all parking and loading areas.
7. The proposed perimeter treatment of the property, with indication of screening materials to be used, including fences, walls, and plants, together with a description of uses, setbacks and the relationship to surrounding areas.
8. A landscape plan showing proposed treatment of the areas designated as either buffers or open space.
9. The location and dimensions of all existing and proposed easements and public improvements on the site.
10. The location and size of all structures, distances between buildings, and distances from structures to property lines.
11. The location and description of all signage, including façade signs on buildings.
12. The proposed use of all structures and their dimensions, i.e., height, floor areas, entrances, and loading areas.

The MPC staff report described this stretch of Kings Highway as "a commercial corridor within a mostly residential area." It noted that nearby grocery stores and gas stations sold beer and wine, but the closest liquor retailer was a Walmart Supercenter, on Shreveport-Barksdale Highway, 2.2 miles away; thus, "it is difficult to provide a compelling reason, from a land use perspective, to recommend denial of this request." A recent request to open a gas station and convenience store one block away "was met with considerable opposition"; hence, "It is clear that, in general, there is little public support of new high alcoholic content retailers in this section of Kings Highway." However, to "protect the health, safety and welfare of the public," the staff recommended limiting the hours of operation to 8 am to midnight. It also recommended extensive pavement changes "to direct

10

pedestrian and vehicular traffic * * * as far away from the residences as possible," and various aesthetic revisions.

As noted, the Council devoted about three hours to this matter, receiving testimony from 21 live witnesses who were opposed, three in favor. We will not attempt to summarize the entirety of this transcript, much of which digressed into general malaise about falling property values and the likely clientele of a store like Lakeshore. The chief of police of Centenary College and the principal of Byrd High School both feared that students would be exposed to risks from the additional foot traffic to and from a liquor store; two nearby residents described their negative experiences with other liquor stores. Most felt that crime was sure to follow a retail liquor outlet.[6] However, a retired Shreveport Police Department lieutenant testified that even a liquor store is better than a vacant building, under the "broken window" theory of policing. Another witness stated that Mr. Woods had a "squeaky clean" record of business dealings and had created hundreds of jobs for the community.

In response to the concerns about crime, and the perception of when it is likely to occur, a councilmember proposed limiting Lakeshore's hours to "eight to eight." After extensive discussion, a resolution to grant the SUP, with hours from 8 am to 9 pm and the aesthetic revisions described earlier, passed 6-1.

This synopsis of the proceedings makes it clear that the Council closely considered the approval standards. Amending the requested closing

---

[6] This court also observes that a large number of the signatures on the "Petition to Oppose Liquor store at Corner of Gilbert & Kings Hwy." listed addresses from out of town, even out of state.

11

time of midnight to 9 pm shows consideration of the perceived risk of criminal activity (public health, safety, and/or welfare); the closure of the Gilbert Drive entrance is an obvious response to traffic safety; the fact that Kings Highway is mainly commercial satisfies compatibility (general land use of adjacent and other property within 300 feet); and the numerous aesthetic revisions echo, almost verbatim, the remaining standards. Gladstone's contention that the City failed to present *any evidence* to support the Council's action is disingenuous and unconvincing.

Gladstone further contends that the evidence was "overwhelming and uncontradicted" against granting the SUP. Gladstone's brief, however, conveniently omits any mention of the MPC's staff report, the witnesses who testified in favor of the SUP, the closure of a driveway, the severe limitation of business hours, and the numerous aesthetic revisions to the property; any suggestion that evidence against granting the SUP was "uncontradicted" borders on the frivolous.

This court agrees that in terms of numerosity and passion, the witnesses opposing the SUP preponderated, and nearly overwhelmed, the hearing. However, the standard for overturning the zoning decision is a showing that it is "palpably erroneous and bears no substantial relation to the public health, safety, or general welfare." *Toups v. City of Shreveport*, *supra*; *Racetrac Petroleum v. City of Shreveport*, *supra*. When there is room for two opinions, an action cannot be arbitrary and capricious when exercised honestly and on due consideration. *Toups v. City of Shreveport*, *supra*; *Carter v. City of Shreveport*, *supra*. On de novo review of this record, we cannot say that the Council's action was palpably erroneous and bore no substantial relation to public health, safety, or general welfare.

Gladstone also argues that because two councilmembers held Mr. Woods in esteem, they granted "their friend a monopoly" and thus took an arbitrary, capricious action. Lakeshore responds that as a Black American, Mr. Woods can offer equal opportunity in business and employment, a fact that the Council was entitled to consider.

Section 16.3 does not mention esteem or personal acquaintance as a factor in approving or denying an SUP. In other contexts, courts define "arbitrary" as "based on random choice or personal whim, rather than reason or system," and "capricious" as "given to sudden and unaccountable changes in behavior." *La. Bag Co. v. Audubon Indem. Co.*, 08-0453 (La. 12/2/08), 999 So. 2d 1104; *Black v. Lofland Co.*, 37,862 (La. App. 2 Cir. 2/26/04), 869 So. 2d 264, *writ denied*, 04-0787 (La. 6/4/04), 876 So. 2d 94. Voting in favor of an applicant who is a successful businessman, combat veteran, and community leader strikes us as the opposite of random choice, personal whim, or unaccountable change. Voting in favor of someone who *lacked* these qualities might be arbitrary and capricious. The instant record falls far short of proving an arbitrary, capricious action on the part of the Council. Gladstone's contention is unpersuasive.

Gladstone's arguments concerning lack of compliance with or consideration of the approval standards lack merit.

### *Other Arguments*

Gladstone has raised other issues without specifically designating them as errors.

First, Gladstone argues granting Lakeshore's SUP was arbitrary and capricious because six days earlier, the MPC denied a virtually identical SUP. Specifically, Gladstone attached the MPC staff report for a request to

13

expand an existing convenience store at the corner of Centenary Blvd. and Olive Street into a liquor retail outlet; the staff report recommended denying this. Gladstone shows that where permits are granted in similar situations and refused in others, the refusal to grant a permit may constitute nonuniform application of zoning ordinances that is arbitrary and capricious. *King v. Caddo Parish Comm'n*, *supra*; *Clark v. City of Shreveport*, 26,638 (La. App. 2 Cir. 5/10/95), 655 So. 2d 617.

The similarities between the Centenary and Lakeshore SUPs fade on closer examination. Both tracts are zoned C-2 and back onto residential lots. However, the staff report described this part of Centenary as a "short commercial corridor," "very small and narrow, * * * essentially a residential area"; nearby properties had various uses, including residential and several vacant lots; notably, the owners had previously lodged eight requests to upgrade this property to retail liquor sales, a lounge, or a restaurant selling alcohol; all had been denied. By contrast, Lakeshore's Kings Highway site is on a long corridor densely populated with businesses; it had been approved for upgrades from residential to business, and then to commercial, in 1968 and 1980; while other requests for retail liquor sales in the vicinity "had not been well received by residents," the proposed stipulations would mitigate the effects. The staff reports, fairly reviewed, show an adequate basis to deny the Centenary SUP and grant the Lakeshore SUP.

At trial, there was also discussion of the denial of SUP for retail liquor sales at the former Don's Restaurant, only a block away from Lakeshore, as proof that the Council was granting SUPs inequitably. However, aside from the argument of counsel, the record contains no evidence regarding that application. As Gladstone itself has ably shown, rank speculation, without

14

the assistance of evidence, will not suffice to meet the burden of proof. *D'Argent Props. LLC v. City of Shreveport*, 44,457 (La. App. 2 Cir. 6/24/09), 15 So. 3d 334, *writ denied*, 09-1726 (La. 11/6/09), 21 So. 3d 308. On this record, the denial of other SUPs does not prove that the grant of Lakeshore's SUP was arbitrary and capricious.

Finally, Gladstone cites the fact that three months after approving Lakeshore's SUP, the Council unanimously approved an ordinance (Ord. No. 191) prohibiting retail liquor sales on any C-2 property "which abuts a residential zoning district." Gladstone shows that every councilmember who voted to grant Lakeshore's SUP also voted for Ord. 191, which would have denied Lakeshore's SUP. One councilmember admitted telling Mr. Woods, "I did not want to vote for another liquor store close to a neighborhood. His would be the last." Gladstone submits that the enactment of Ord. 191, an apparent change of heart, proves that granting Lakeshore's SUP was arbitrary and capricious.

In the absence of contrary legislative expression, substantive laws apply prospectively only. La. C.C. art. 6. The law may not be applied retroactively if it would impair contractual obligations or disturb vested rights. *Born v. City of Slidell*, *supra*; *M.J. Farms Ltd. v. Exxon Mobil*, *supra*; *Yates v. Marston*, 48,009 (La. App. 2 Cir. 5/22/13), 121 So. 3d 673, 183 Oil & Gas Rep. 32. To apply Ord. 191 retroactively to a matter that was decided three months before its passage would plainly violate Art. 6's principle of prospective operation. To find, as Gladstone suggests, that the Council's subsequent amendment of the UDC proves arbitrary and capricious conduct, and thereby invalidates the grant of Lakeshore's SUP,

would be to reach the same result prohibited by Art. 6.  We decline to accept that proposal.

Gladstone's arguments alleging unequal treatment and a subsequent amendment to the UDC lack merit.

## CONCLUSION

For the reasons expressed, the judgment of the district court is reversed.  Judgment is rendered herein confirming the action of the Shreveport City Council of October 8, 2019, which granted a special use permit to Lakeshore Liquor, Beer & Wine 2, LLC.  All costs are to be paid by the appellees, Gladstone Area Partnership Inc., Swan Apartments LLC, and Ashley M. Atkins.

**REVERSED AND RENDERED**.

16

**COX, J., concurs with written reasons.**

I am sympathetic to the neighbors and neighborhoods represented in this matter. I understand that they do not want or condone a liquor store entering their community. However, in our role as the judiciary, we are constrained to follow the law as written. As stated in the opinion written by Chief Judge Moore, we review the zoning decision by determining whether it is "palpably erroneous and bears no substantial relation to the public health, safety, or general welfare." The majority opinion lists the standards Lakeshore was required to meet in order to get approval for their SUP, including the limited hours of operation, closure of the Gilbert Drive entrance, and aesthetic requirements. I agree that, based on the consideration of the standards by the Council, we cannot say that the decision was "palpably erroneous and bore no substantial relation to public health, safety, or general welfare."

The neighborhoods previously argued before the trial court that Lakeshore is "incompatible" with the existing family residences and future improvement of the adjacent neighborhoods. They stated that this liquor store abuts "the stable, family-oriented, and walkable Gladstone neighborhood and is across Kings Highway from the historic Highland neighborhood whose walkability and redevelopment efforts (as well as any halfway houses and addiction treatment facilities) will be hampered by liquor store operations." Although Lakeshore also sells liquor, there are several businesses within one block of Lakeshore that already sell beer and wine, including Brookshire's and Circle K. This is not a case of liquor being introduced into a dry area, as alcohol was already being sold in neighboring businesses. Because alcohol is already sold in the area, persons who live in

1

the halfway houses, addiction treatment facilities, or are in alcohol recovery in the area already have access to alcoholic beverages in close proximity of their residences.  As such, even though I am sympathetic to the public sentiment against this store, I am constrained by the laws as passed by the legislative branch and must concur in the majority opinion.